**John F. McNULTY, Plaintiff,**

v.

**GREAT AMERICAN INSURANCE CO., Defendant.**

**Civ. A. No. 88–0894–Y.**

United States District Court,
D. Massachusetts.

Dec. 14, 1989.

Richard J. Shea, Tighe, Curhan, Burwick & Piliero, Boston, Mass., for plaintiff.

Roger Emanuelson, Lecomte, Emanuelson Tick & Doyle, Boston, Mass., for defendant.

MEMORANDUM AND ORDER

YOUNG, District Judge.

This action is brought by John McNulty ("McNulty"), who holds a second mortgage on a property destroyed by fire, to recover money allegedly owed him by the mortgagee's insurance company, Great American Insurance Co. ("Great American"). He asserts two causes of action: one for breach of an oral contract between himself and Great American; the second under the Massachusetts Uniform Commercial Code ("U.C.C."). The parties have filed cross-motions for summary judgment.

A party in a civil case is entitled to summary judgment in his favor if he can show that there is no genuine issue of material fact and that he is therefore entitled to judgment as matter of law. Fed.R. Civ.P. 56(c). Entry of summary judgment is also appropriate where a party, having had adequate time for discovery, still "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When the defendant in a civil case moves for summary judgment, the test to be applied is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Based on the record before the Court, the following undisputed facts reasonably could be found by a jury. Great American issued an insurance policy to Standard Motor Products Co., Inc. on property located on Bridge Street, Salem ("the property"). The policy covered fire and was in effect when a fire damaged the property on December 11, 1982. The insurance policy reflected that the only named mortgagee for the property was the Eastern Savings Bank. At the time of the loss McNulty held a second mortgage on the property. He claimed an interest in the insurance proceeds, which Great American assessed at $115,000.

In the spring of 1983, at the request of the Great American agent handling the claim, Mr. Fronduto ("Fronduto"), McNulty provided Great American with proof of his interest in the property, including a copy of the second mortgage and a Certificate of Insurance from Great American dated May 6, 1982, which named McNulty as second mortgagee. On June 15, 1983, McNulty wrote to the attorney for Great American, complaining about delays in getting his money and threatening suit. *See* Plaintiff's Exhibit C. A memorandum, dated June 30, contains Fronduto's notes of a phone call between himself and Great American's attorney, in which Fronduto recognized that if McNulty "can show he has a legit interest it appears we may end up honoring same." Plaintiff's Exhibit D. The memorandum suggests that both Fronduto and counsel were worried that a Great American agent may have "locked us into this situation by misusing the certificate of insurance which added McNulty as a 2d mortgagee." *Id.* According to McNulty, Frontudo admitted at some time in the fall of 1983 that McNulty's name "had been [mistakenly] deleted." McNulty Dep., Plaintiff's Exhibit F, at 26. The June 30 memo indicates that Fronduto asked the attorney to respond to McNulty's letter "before we find ourselves defending another suit." Plaintiff's Exhibit D.

Four weeks later, on July 28, 1983, Great American issued a $115,000 settlement check, naming as payees all persons known to have an interest in the property. Named on this check were Standard Motor Products Co. (the insured), Bridge Street Properties (the landlord), Eastern Savings Bank (the first mortgagor), McNulty, Richard Stanley (the fire inspector for the City of Salem), the City of Salem, and the M.H. Noonan Co. (for necessary demolition work after the fire).

Alan Sullaway ("Sullaway"), principal owner of Bridge St. Properties, Inc. and president of Standard Motor Products, physically returned the check to Great American and requested a new check be issued, a check that would name only the Eastern Savings Bank as payee. Ralph Wright ("Wright"), Senior Vice President in Mortgaging Service at Eastern Savings Bank, also wrote to Great American's counsel with the same request. Sullaway and Wright felt that McNulty had unjustifiably refused to endorse the check, because of some conflict or unrelated business transaction between him and the two of them. McNulty, for his part, asserts that he knew the check existed and that he neither refused to endorse it nor approved of its return to Great American. *See* McNulty Dep. at 25. Wright promised that the Eastern Savings Bank would indemnify Great American against claims relative to the distribution of the money if it issued another check. Great American then stopped payment on the old check and issued the new check, dated September 20, 1983.[1]

---

**1.** Payments were made out of that new check for $115,000 as follows: Bridge Street Properties was paid $36,485.14 for the repairs, and $22,087.31 for the restoration (total = $58,572.45). Eastern Saving Bank, 1st mortgagee, apparently had a $68,500 interest, *see* Plaintiff's

During this time, the fall of 1983, McNulty was involved in a lawsuit with the first mortgagee, Standard Motor Products, and another party. In October 1987, he settled with Standard Motor Products for consideration apparently totalling $530,000, which represented 40 cents on the dollar of his claim against Standard Motor Products.

McNulty, a citizen of Massachusetts, filed this suit on April 19, 1988. Great American is an Ohio corporation with its principal place of business in Ohio. Thus, jurisdiction in this Court is properly based on diversity of citizenship between the parties. 28 U.S.C. sec. 1332(a) (1982). Massachusetts substantive law applies to McNulty's claims.

McNulty claims Great American breached its oral contract with him. The alleged contract consisted of an exchange of promises—McNulty promising not to sue about how, why, and by whom his name was deleted as second mortgagee and Great American promising to pay McNulty the amount of his loss, witness the first check of July 28, 1983. McNulty asserts that Great American breached by issuing the second check naming only the Eastern Savings Bank as payee. McNulty's second asserted claim in this action is that the first check was "lost, whether by destruction, theft or otherwise" within the meaning of section 3–804 of the U.C.C., codified in Massachusetts at Mass.Gen.Laws Ann. ch. 106, sec. 3–804 (West 1958). By proving his right to ownership of the check, its terms, and the fact of its destruction,

McNulty alleges that he "may ... recover from any party liable thereon." *Id.* Great American denies any promise on its part, denies that there was ever any agreement, asserts a lack of consideration defense to the contract theory, and argues that section 3–804 is inapplicable to this case.[2]

## I. Count I: Breach of Oral Contract

■ Two material facts at issue in Count I preclude summary judgment. The first is whether Great American orally promised that McNulty would be included as a payee on the face of the check representing the insurance proceeds. The second factual issue is whether the promise, if made, was given in exchange for McNulty's promise not to sue.

The parties' accounts with respect to the alleged agreement to pay McNulty's loss are irreconcilable. McNulty certainly threatened legal action and Fronduto apparently feared a lawsuit, but whether Great American or one of its agents actually made an independent promise to pay McNulty's claim is disputed. Great American disputes whether bargained-for consideration actually passed to it in the form of McNulty's promise not to sue. Great American disputes it ever promised McNulty anything and argues that even if there was such a promise, there was no valid consideration to bind the parties.[3] The dispute, simply, is whether there was ever an agreement between the parties whereby McNulty would be paid "the amount of his loss" in consideration of his not suing the

---

Exhibit D, but must have been owed over $10,000 in arrearages. The Bank took $10,696.95 to make up for overdue mortgage payments *and took a $30,902.94 payment to the principal of the mortgage,* reducing it to $37,000. *See* Wright Dep., Defendant's Exhibit C, at 12. Richard Stanley, the "fire adjuster," was paid $7,866.66. *Id.* And M.H. Noonan Co. was paid $6,241 for demolition costs. *Id.* This adds up to roughly $114,280.00. McNulty got nothing. The City of Salem, another payee on the original check, also does not appear on the second check.

**2.** Great American also asserts as a defense to the alleged oral contract that this is a claim on the insurance policy and is therefore time-barred under Mass.Gen.Laws Ann. ch. 175, sec. 99 (West 1987) which contains mandatory language for fire insurance contracts, requiring a

suit "for the recovery of any claim by virtue of this policy" to be commenced within two years of the loss. This argument cannot stand. It is evident that this is not a claim by an insured "on the policy." It is a suit on an alleged oral promise that stands independent of the policy. *Cf. Jenney v. Airtek Corp.,* 402 Mass. 152, 154, 521 N.E.2d 388, 390 (1988) (cause of action for unpaid attorneys' fees accrued not when services terminated, but upon the end of an additional 45–day period in which the defendant had independently agreed to pay).

**3.** McNulty does not assert that he changed his position in reliance on the representations of a Great American agent with apparent authority to bind the company and so the Court inquires only into whether consideration passed between the parties sufficient to create a contract in law.

insurance company for not having placed him on the policy as second mortgagee as he should have been. Great American's view of the facts finds some support in the record before the Court. When Great American wrote the initial settlement check, McNulty may have been included—not in exchange for his forebearance—but simply because the insurance company felt that McNulty should be able to work out his share with the other copayees. The record presently before the Court would permit a jury to so infer. Since there are material issues of fact genuinely in dispute with respect to McNulty's first claim, summary judgment accordingly is denied both parties on this count.

## II. *Count II: "Lost" Note Analysis under Uniform Commercial Code section 3–804*

■ Section 3–804 of the Uniform Commercial Code states:

The owner of an instrument which is lost, whether by destruction, theft or otherwise, may maintain an action in his own name and recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms. The court may require security indemnifying the defendant against loss by reason of further claims on the instrument.

Mass.Gen.L. ch. 106, sec. 3–804. Before applying section 3–804 to the note in this case, the Court must determine if the note is "lost" within the meaning of the statute. Generally, "[a] note can not be considered to have been lost so as to permit action on it as a lost note if the party in possession of it is known to plaintiff and the ownership is in dispute." *Dluge v. Robinson,* 204 Pa. Super. 404, 204 A.2d 279, 281 (1964) (quoting 54 C.J.S. *Lost Instruments* sec. 2).

This Court rules that the note in this case is not "lost." None of the cases cited by plaintiff pertaining to lost instruments describe joint payee notes. The cases cited describe instruments which have been lost due to an inadvertent mistake or by an unintentional surrender of the note to the maker. In *American Cement Corp. v.*

*Century Transit Mix, Inc.,* 3 U.C.C.Rep. Serv. 424 (N.Y.Sup.Ct.1966), a payee returned eight negotiable notes to the maker under the belief that the eight notes would be replaced by eight new, negotiable notes. *Id.* at 425. The eight new notes that were received, however, were not negotiable because the maker inadvertently forgot to endorse them. *Id.* The court held that the original notes which had been surrendered to the maker were "lost" because the payee was mistaken in believing that he would receive eight new, negotiable notes in the same amount as the original notes. *Id.* at 426. In addition, the court noted that the payee did not have an intention to discharge the underlying debt and therefore there was no surrender of the notes—rather, they were "lost." *Id.* at 425. In *Chicago Title and Trust Company v. Walsh,* 34 Ill.App.3d 458, 340 N.E.2d 106 (1975), the court held that a check is lost when a bank, upon dishonoring a check, returns the check to the maker rather than to the payee. 340 N.E.2d at 112. The payee did not intentionally surrender his possession of the note to the maker. An independent party—the bank—surrendered the note, not the payee. Therefore, section 3–804 allowed recovery under the note. *Id.* Finally, in *Hamilton Watch Employees Federal Credit Union v. Retallack,* 5 U.C. C.Rep.Serv. 739 (Pa.Ct. Common Pleas 1967), the court held that the mistaken return of a note to the maker by an employee of the payee is sufficient to allege that the note is lost under U.C.C. sec. 3–804. *Id.* at 741.

In contrast to these cases, the facts of this case strongly suggest that Eastern Savings Bank and the insured, the payees who returned the check to Great American, were not under any mistaken belief. Rather, the facts suggest that they intentionally attempted to surrender the note to the maker without all of the payees' consent. Although the plaintiff in this case is a payee and was unaware of the attempted surrender of the note, the actors who returned the old check and received a new check were payees also. In this situation, the Court does not consider the note "lost" because several of the payees, if not all,

intentionally attempted to surrender the note. A note should not be considered "lost" solely because it has been transferred improperly. In the cases involving lost notes cited above, the plaintiff was unable to bring an action for conversion because the plaintiff was a sole payee and he voluntarily, whether by an unintentional act or by action taken under a mistaken belief, returned the check to the maker. In these situations there is no wrongful deprivation and the plaintiffs, therefore, would have been precluded any recovery absent the remedy found in U.C.C. section 3–804 for "lost" instruments. The case at hand, however, does not fit into this type of situation because McNulty did not voluntarily surrender the note to the maker. In the case of joint payees, an action for common law conversion is applicable because there is a wrongful deprivation from the non-consenting payee.

The U.C.C. specifically states that a note which has been destroyed or stolen will also qualify as a "lost" note under section 3–804. In the case at hand, neither party has alleged that the note was destroyed. The facts are uncontroverted that two payees returned the original check to Great American, that it put a stop payment on the check, and that it then issued a new check for the same amount as the first check, the second check being payable solely to Eastern Savings Bank. Under these facts, there is no evidence that the original note was destroyed.

In addition, neither party has specifically alleged or submitted evidence that the note was stolen. Theft is defined as "[t]he taking of [another']s property without the owner's consent." Black's Law Dictionary 1324 (5th ed. 1979). Conversion is defined as "[a]n unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the

exclusion of the owner's rights." *Id.* at 300. Although common law conversion, as defined above, seems to fall within the definition of "theft," the U.C.C. has limited the definition of conversion.[4] The note in this case has not been stolen because the Eastern Savings Bank and Allan Sullaway acting for the insured were owners and were thus dealing with property in which they had an interest when they attempted to surrender the note to the maker.[5] In addition, the note has not been converted under the U.C.C. definition of conversion because the note was not presented to anyone for payment and the note was not forged. Mass.Gen.Laws Ann. ch. 106, sec. 3–419 (West 1958).

Under these circumstances, recovery under Mass.Gen.L. ch. 106, sec. 3–804 for a note which is "lost, whether by destruction, theft, or otherwise" is not available in this case. This Court accordingly grants summary judgment for Great American on Count II of the complaint.

### III. *Common Law Conversion*

■ It should be noted that the common law of conversion has not been displaced by the U.C.C. in areas where section 3–419 is not directly applicable[6] and therefore a claim for conversion of a negotiable instrument under the common law may be available against Great American. *Commercial Credit Corp. v. University National Bank of Fort Collins,* 590 F.2d 849, 851–52 (10th Cir.1979). Conversion of a negotiable instrument consists of "the wrongful deprivation of property which the plaintiff is entitled to possess." *Id.* at 852, (quoting 18 Am.Jur.2d *Conversion* sec. 25 [1965]). The basic principle under the U.C.C. with respect to joint payees is that to transfer or negotiate an instrument payable to joint payees, all must endorse it. Mass.Gen.L. ch. 106, sec. 3–116(b) (1958). It is also commonly understood that an attempted

---

**4.** An instrument is converted when (a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or (b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or (c) it is paid on a forged indorsement. Mass.Gen.Law Ann. ch. 106, sec. 3–419(1) (1958).

**5.** *Cf. Winn v. First State Bank of Irvington,* 581 S.W.2d 21 (Ky.Ct.App.1978) (physical possession of instrument evidence of ownership).

**6.** *See* 2 R. Anderson, *Uniform Commercial Code,* sec. 3–419:18 (1984 and 1988 Supp.).

renunciation by less than all of the joint payees is not effective to discharge an instrument because the indorsement or consent of all joint payees is required. *See* 5 R. Anderson, *Uniform Commercial Code,* sec. 3–116:16 (1984 & 1988 Supp.).

McNulty was one of seven joint payees on the original check. He had the right to possess the check, an essential element needed to bring an action for conversion. *Id.,* vol. 6, sec. 3–419:25; *Trust Co. of Columbus v. Refrigeration Supplies, Inc.,* 241 Ga. 406, 246 S.E.2d 282, 284 (1978). In *Trust Company of Columbus,* a defendant argued that since the maker of a check to joint payees did not receive consideration for placing one payee on the check, that payee could not bring an action against the defendant for accepting the check without that payee's endorsement. 246 S.E.2d at 284. The court stated that " 'it is the maker's exclusive privilege to designate the payees of his checks' " and therefore an omitted payee may bring an action for the payment of a check without his endorsement regardless of whether there was consideration for his being named as a payee. *Id.* (quoting *Pacific Metals Co. v. Tracy-Collins Bank etc. Co.,* 21 Utah 2d 400, 402–03, 446 P.2d 303, 305 [1968]). The measure of damages, however, is ultimately determined by the actual damage suffered by the omitted payee. *Id.* 246 S.E.2d at 285.

Although *Trust Company of Columbus* involves a bank which accepted a check for payment, this Court considers the case to be analogous to the situation at hand. Great American had the right to place a stop payment on its check at any time prior to the presentment of the check for payment. However, when Great American placed the stop payment on the check immediately after Sullaway and Eastern Savings Bank attempted invalidly to surrender it, a reasonable jury could infer that Great American converted the check by accepting possession of the check after an invalid surrender.

IV. *Conclusion*

For the reasons expressed above, the cross motions for summary judgment are DENIED as to Count I; Great American's motion for summary judgment in its favor is ALLOWED as to Count II; and McNulty shall have thirty (30) days from the date of this order to move to amend (if he can properly do so in good faith pursuant to Fed.R.Civ.P. 11) to add a count for conversion at common law against Great American.